Mr. Hong Wong is a citizen of the United States and a United States Marine Corps veteran. He's improperly imprisoned at the MDC because the district court committed legal error in its analysis of the Title 18-3142G factors. The legal error as set forth in our brief is that the court improperly injected the circumstances of the offense under G1 for which Angwang is presumed innocent into its analysis of his history and characteristics under G3. Given the error, this court should engage in a de novo review of the 3142G factors and grant Angwang's release. The first factor under G1, nature and circumstances, weighs heavily in favor of release. Mr. Angwang is charged principally with failing to register as a foreign agent. He's not charged with espionage. The government does not argue that he did anything with classified secret or danger to the community. They described the case as a run-of-the-mill 951 charge. If convicted, the likely sentence would be less than 48 months and could easily result in a mere sentence of probation, nowhere near the 55 years the government predicted in its memo seeking detention. Factor two goes to the weight of the evidence. I'll skip that in the interest of time but glad to answer questions if you have any. I'm going to move to factor three which is history and characteristics of the defendant. Here, Mr. Angwang scores high marks. He's an American citizen with no criminal history, a Marine Corps veteran, New York City police officer, married to an American citizen. He owns his own home on Long Island where he lives with his wife and his daughter who will turn three this weekend. At the bail hearing, three Marine Corps veterans with whom he trained and served in Afghanistan stepped forward to sign a million-dollar bond to guarantee his return to court. A total of nine financially responsible co-signers agreed to sign the million-dollar bond as well. You cannot ask for a more powerful expression of support for a person's responsibility. Simply put, the bond is approved by Magistrate Judge Bloom more than reasonably assured that Mr. Angwang would return to court rather than forsake his life in America to avoid a minimal prison sentence. As things stand, unless he is released, we'll start that sentence before his case. Mr. Karmann, this is Judge Wesley. You're on a roll there, but I want to ask you a couple questions, okay? Because you don't have too much time. The district court seemed to be quite concerned with its characterization of your client as being untruthful. Would you address that briefly for us, please? I think it goes to two different points. First, the court, I think, basically assumed the guilt of my client in making the bail determination. There's this second area of concern that involves the pretrial services interview of Mr. Angwang prior to his initial appearance. Again, this is at a time when I have no contact with the client. We, to this day, don't have any true sense of what the questions were that were asked, how the answers were presented. At best, there's some incomplete record here as to whether he would have misrepresented this employment with this private Chinese individual in 2014, which has nothing to do with his case and for which there's no motive to lie. I think it's a red herring. I think the judge got caught up in it, and I think it was improperly considered in the ultimate bail decision. Was there also some... Maybe I'm misreading your papers, but was there also some assertion that you may have misspoken in some way with regard to this? Your Honor, I think that the court suggested that. What I would say is, number one, I didn't have contact with my client on a very limited basis. I didn't necessarily have all of the information from my client as to the issue and the facts concerning his relationship with this private citizen, so I don't think I misspoke. I think that was a mischaracterization by the court, although I will say I was working with less than a full set of the facts at that time. Yeah, and as I understand it, is he at the MDC? Is that where he is now? He is. He is in solitary confinement, basically like the rest of everyone else that's incarcerated there. Okay, and how often do you get to see him? I have just been able to see him one time. We are limited to one-hour meetings, and so I should add that his family is entitled to two hours a month, and we have to prearrange phone calls, which generally speaking, we can get within three or four days if we ask nicely. Okay, and have you been given a trial date by the court? The government has just put the court on notice that they intend to introduce FISA evidence that there will be a protracted procedure for disclosing Foreign Intelligence Surveillance Act evidence to the defense. It could take literally months. At the end of January, they're saying they'll file their motion. I don't think we'll have a trial in this case until 2022, 2023. Judge Walker, questions? No, I have no questions. I have a question. The district court said that in the majority of cases where the defendant was accused of similar crimes, the defendant was detained pending trial. Do you dispute that characterization or have some way of distinguishing the present case? I think that we did it in our reply brief, and we ran through the cases that were cited by the government for that proposition, and in those cases, the key distinguishing fact is that the people that were charged with the were not American citizens, unlike Mr. Ong Wong, who is. With respect to the allegations of deceitful character that Judge Wesley raised, the court mentioned that these allegations I'm quoting are of deceit are, of course, there are indications of the defendant's lack of candor with the district court, even on the admitted facts. Could you help me understand why this language doesn't demonstrate that the district court relied on established facts, not the complaint allegations to conclude that your client had been deceitful? I think that the district court was relying on the fact that there was no indication in the pretrial services report that Mr. Ong Wong was either asked or said that he had informal employment with somebody in 2014. It said that he acknowledged his employment with the NYPD. He acknowledged that he'd been in the United States Marine Corps. He served in the United States Marine Corps, and he acknowledged that he was a member of the Army Reserves. There is this question about what was he asked about his employment, and what did the pretrial services officer write down? Again, this is something that the judge took time to ask us to brief these other issues about the potential sentences and the likelihood of denaturalization. These things all ended up in our favor, yet if the judge was so concerned about this exchange between pretrial and Mr. Ong Wong, it seems to me that it wouldn't have taken much to have him come in, have the pretrial services officer come in and relate the nature of that exchange. The court placed an awful lot of significance on this exchange, and we know so little about it. Thank you. You'll have one minute in rebuttal. We'll now hear from your adversary. Good morning, your honors, and may it please the court. This is Matthew Higgins today on behalf of the United States. The district court's detention order should be affirmed. To reverse, this court must be left with the definite and firm conviction that some mistake has been committed, and the record presented falls far short of meeting that high hurdle. The core thrust of the appeal is this notion that the district court erred by weighing the defendant's deceits in somehow the wrong place or the wrong order under the Bail Reform Act, but there's not any serious argument presented either below or here today that the defendant's conduct did not present a significant risk of flight to a country, the PRC, in which the defendant had deep family and government ties, and a country with which the United States has no extradition treaty. Under the Bail Reform Act, the district court is required to evaluate the nature of the offenses, the weight of the evidence, and the history and characteristics of the defendant, and the offense conduct turning to the first factor alleged here was serious, and it was pervasive. The defendant offered the PRC information on the workings and internal operations of the New York City Police Department, a crucial law enforcement organization in this region and in this country. He acknowledged on recorded calls that the PRC had successfully recruited him. He said to his handler that he hoped it would boost the handler's status within the PRC government. He agreed with his handler to recruit additional sources to, quote, diversify that official's network within the United States, and this was all while he was process that he had contacts with foreign establishments, of which the consulate and these officials clearly were. The district court also expressed its significant concerns and correct concerns about the severe risk of flight in this case. The complaint has several references about the defendant's interest in bringing glory to China. The defendant indicated on one of the recorded calls that he would be content to return to the PRC, to live there full time, and indeed to work for the PRC government, and the defendant indicated on one of those calls that he hoped that his handler would return to mainland China, move up or be promoted, and be in a position to invite the defendant to return back to the PRC. Judge, what about the court seeming to focus on this alleged deceit with regard to the interview by pretrial services? What do you make of that? Yes, your honor. There's some additional context to that that I think it's important for the court to understand. In the course of executing the arrest and searching the defendant's residence pursuant to a warrant, the government located a number of identification documents, some New York state driver's licenses, several of which were expired, some photocopies of various visas and passports, one for St. Kitts and Nevis, and a few for the PRC itself. And the concern the government expressed was this is a risk of flight case in which the defendant has significant ties to a foreign country and for some reason, that is not clear at this point, has possession of these various identification documents. Wait a second. Were these documents in which he was, is your assertion that somehow he was going to attempt to use another identity? Is that it? Not quite, your honor. They're not very helpful if they're documents of a woman, are they? There's not much information here to make some kind of leap that these documents somehow translate into a desire to leave. How do you make that connection? It's not so much the possession of the documents, your honor, as what the possession represents. The possession represents access to those kinds of documents. And in this... Does the defendant have a passport? I believe that's been surrendered to pretrial services. Oh, he does have a passport. Did the... Was there any representation as to whether his wife has a passport or his child has a passport? I don't know if that's in the record, your honor. The wife does. I don't understand the risk of... I mean, I appreciate the risk of flight in the context that he came from the People's Republic of China, but now he's a United States citizen. So I don't understand. You think he's got a little child and his wife, and yet there's no information about how they might be making preparations to leave or anything else like that. I mean, obviously, anybody who's charged with a crime, early serious crime, has got someplace to go. There's always a risk of flight. That's why you have them post bail. I mean, if they were at risk of flight, you wouldn't have them post bail, would you? You just release them on their own recognizance, but you never do that. So that's what bail's all about. So I don't understand. I don't understand how you make so much of that. So go on. Tell me more. Three brief responses, your honor. First, in this kind of case, the defendant knows to whom he can turn to find additional identification documents, his handlers at the PRC consulate who would be in a position to issue them. Second, in respect... I thought you knew that. That's fair. In respect of the possibility of flight, the government also noted to the district court the substantial funds transfers, more than $200,000 that were associated with the defendant. Okay. And he'd previously been to the PRC, right? He'd been on at least three occasions, notwithstanding the fact that he sought asylum in the United States. That is correct, your honor. And the third point in relation to his spouse and their minor child, the spouse, the government noted below, the spouse maintained significant family ties in the PRC, as does the defendant. And while the government certainly appreciates relocation of a minor child is never a minor matter, in this instance, the defendant had a haven to which he could flee, a handler to whom he could turn for assistance and funds apparently on which he could rely. Okay. Judge Walker? Well, the only question I have then is I take it as the government's position that he could go to the consulate. Once he's in the consulate, he's out of U.S. jurisdiction. He's in China, effectively. And they could issue appropriate documents if he is, in fact, working for the government, documents to get him out of there. Now, as far as his wife is concerned, she wouldn't necessarily have to travel with him. She could come later and there'd be no restrictions on her traveling with her. I mean, there's no basis to restrict her traveling by the government, by our government. The court is correct to the jurisdiction within the consulate, and I'm unaware of any restrictions upon the spouse's travel. Okay. That's what I wanted to know. I have some questions about your reliance on the risk of denaturalization argument. That I have is a few questions, but in response to the district court's request for supplemental briefing on whether the government will commence denaturalization proceedings against the defendant, what you say is, I'm quoting, Ang Wang may be subjected to denaturalization, although the government cannot predict at this time whether that will come to pass. How can we say that this is even a meaningful risk when the government cannot tell us whether it will move for denaturalization? Will the government move for denaturalization or not? Unfortunately, I'm not in a position to state affirmatively up or down in this session, but the court can weigh the risk, even if it's perhaps a remote risk, in the context of the severity of that sanction, if that risk were to come to fruition. Can you prevail even without the denaturalization argument? Yes, we can, Your Honor, because it would still go to the defendant's ties to the United States. As the district court properly noted, the defendant's conduct and service to the PRC as an asset directly undermines his other presentation as to his continuing ties to the United States. That undermining occurs whether the defendant is a citizen or not, whether he's a naturalized or natural citizen of the United States. Because I would think that your argument would be stronger without the risk of denaturalization being thrown in. What you seem to be saying, and correct me if I'm wrong, is that the district court's iteration of the risk of denaturalization is supported by, is buttressed by a number of considered the possibility of removal or deportation in assessing flight risk. But all of those cases involved non-citizens, and you correct me if I'm wrong about this, and here we're talking about somebody who is a citizen, correct? He is a citizen, that's correct, Your Honor. But the analogy that you're drawing is not apt. Isn't there a difference in the likelihood of deportation for a defendant is a United citizen? It's a question of the incentives presented to the defendant, Your Honor. And a defendant such as this who's facing the possibility of denaturalization is in many ways in the same shoes as a non-citizen facing the possibility of deportation. The end of the case, if it proceeds to conviction, the end of the case for either is likely mandatory removal from the United States. And the incentive for the defendant is- But you're not willing to say that that will happen. You're not willing to say whether there in response to repeated questions. It's the risk as the defendant assesses it that I think is what should motivate this court's view, and I believe motivated the district court below. And in assessing that risk, it adds to the defendant's incentive to flee. If he's going to be denaturalized and removed, if that's a possibility at the end of the case, why stick around and serve potentially a criminal sentence as well? Well, why not send this back to consider without the risk of denaturalization argument? The court certainly has the jurisdiction to do that, Your Honor. I think without the denaturalization argument, the incentives for the defendant to flee are still severe, and those incentives are not overcome by the bail package presented. Thank you. Unless anyone has any further questions we'll hear from, your adversary has one minute in rebuttal. Thank you. Just a point about these handlers at the consulate in New York and the idea that they would be available to provide documentation so that Mr. Ong Wong and his family could travel. Keep in mind, and I think this becomes clear in our brief, the reason that Mr. Ong Wong is dealing with this official at the consulate is that he's an ethnic Tibetan who left China to seek asylum in the United States. Ethnic Tibetans are treated very differently from ethnic Chinese. An ethnic Chinese is permitted to get a 10-year visa to travel to China at the local tourist agency for $50. An ethnic Tibetan is not. To get a 60-day visa, they're subjected to months of interviews. If his father and mother had medical issues in China, it could be months before he's allowed to go there. That's why he's dealing with it. Counselor, this is Judge Walker. He's not just an ethnic Tibetan walking in off the street asking for a visa. He is a person with a history with the Chinese government. It's got to be viewed in that perspective. They can obviously waive some of these greater restrictions for Tibetan Tibetans and expedite his... If he's valuable to them, they will accommodate him. And what's interesting, Your Honor, that's a great question. And what I would say to you is, in the end, they don't give him a visa. Through all of this, he never gets the visa. They don't show any interest or willingness to accommodate his needs. And so either it makes you wonder, did he ever give them anything for all of his posturing and all of his ingratiation? Did he ever give the PRC official at the consulate anything? And I think the resounding answer is no. And it's defined by the fact that he doesn't get what he's there looking for. And that is ability to travel to see his family. Thank you. Your time is up. We thank the parties. We thank you for your arguments. The court will reserve decisions.